IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRYAN DONALD HAYNES,
       Plaintiff,

       v.

REDDY ICE, LLC,
       Defendant.

: CIVIL ACTION NO.
: 1:21-CV-5246-MLB-JSA
:
:
:
:
:
: **FINAL    REPORT    AND**
: **RECOMMENDATION ON A MOTION**
: **FOR SUMMARY JUDGMENT**

Plaintiff Bryan Donald Haynes filed the above-captioned action on December 23, 2021, and filed an Amended Complaint on July 31, 2022. Plaintiff alleges that Defendant Reddy Ice, LLC ("Defendant" or "Reddy Ice"), his former employer, discriminated against him because of his disability, and retaliated against him for requesting a reasonable accommodation for his disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101, *et seq*. Plaintiff also alleges that Defendant subjected him to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*.; and discriminated against him based on his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq*.

The action is now before the Court on the Defendant's Motion for Summary Judgment [36]. For the reasons set forth below, the undersigned **RECOMMENDS**

that Defendant's Motion for Summary Judgment [36] be **GRANTED IN PART,**

**DENIED IN PART**.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from

Defendant's Statement of Undisputed Material Facts [36-6] ("Def. SMF"),

Plaintiff's Statement of Disputed Material Facts [42-1] ("Pl. SMF"), and their

associated exhibits. Some facts may also be taken from Plaintiff's Response to

Defendant's Statement of Material Facts [42] ("Pl. Resp. SMF") and Defendant's

Response to Plaintiff's Statement of Disputed Material Facts [44] ("Def. Resp.

SMF"). The Court may also draw some facts directly from other material in the

record. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited

materials, but it may consider other materials in the record.").

In this District, Local Rule 56.1B explains the requirements imposed on each

party in asserting and opposing motions for summary judgment. Local Rule

56.1B(1) first explains that to present a proper motion for summary judgment, the

moving party must include a statement of the material facts that it contends are

undisputed:

> A movant for summary judgment shall include with the motion and
> brief a separate, concise, numbered statement of the material facts to
> which the movant contends there is no genuine issue to be tried. Each
> material fact must be numbered separately and supported by a citation
> to evidence proving such fact. The court will not consider any fact:

> (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.

LR 56.1B(1), NDGa.

In addition, Local Rule 56.1B(2)(a) requires a respondent to a summary judgment to file a response to the movant's statement of undisputed facts. LR 56.1B(2)(a), NDGa. Local Rule 56.1B(2)(a)(2) then provides that the respondent must respond to the movant's facts or they will be deemed admitted:

> This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1B.(1).

LR 56.1B(2)(a)(2), NDGa.

The respondent to a summary judgment motion must include such responses on an individually numbered basis, with a separate and precise response individually addressed to every one of the movant's statements of fact that the respondent intends to dispute. LR 56.1B(2)(a)(1), NDGa. Moreover, the Local Rules require that, when the respondent intends to refute the movant's fact, the respondent must support such refutations with "specific citations to evidence." LR 56.1B(2)(a)(2)(i), NDGa.

The Eleventh Circuit has held that a failure to comply with Local Rule 56.1 is not a "mere technicality," because "[t]he rule is designed to help the court identify and organize the issues in the case." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009) (*citing Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)). "Local Rule 56.1 protects judicial resources by 'mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge.'" *Reese*, 527 F.3d at 1268 (internal quotes and citation omitted); *see also Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or defense.").

Thus, it is each party's obligation to cite to evidence in the record that establishes a triable issue of fact, and the Court cannot cull through the entire record in an effort to search for evidence that creates a disputed issue. *See United States v. Adkinson*, 135 F.3d 1363, 1378-1380 (11th Cir. 1998); *Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997); *see also Dickson v. Amoco Performance Products, Inc.*, 845 F.Supp. 1565, 1570 (N.D. Ga. 1994) ("It should be the party's responsibility to direct the court's attention separately to each portion of the record which supports each of the party's distinct arguments.").

Accordingly, for those facts submitted by Defendant that are supported by citations to record evidence, and for which Plaintiff has not expressly disputed with

specific citations to record evidence, the Court must deem those facts admitted, pursuant to Local Rule 56.1(B). *See* LR 56.1(B)(2)(a)(2), NDGa. For those facts submitted by Defendant that Plaintiff has failed to dispute with citations to record evidence, the Court must accept the facts as true, so long as the facts are supported by citations to record evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 (N.D. Ga. Feb. 16, 2007).

The Court has also excluded assertions of fact by either party that are clearly immaterial, or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to admissible evidence in the record or asserted only in a party's brief and not in its statement of facts. *See* LR 56.1(B)(1), NDGa; *see also* LR 56.1(B)(2)(b) (respondent's statement of facts must also comply with LR 56.1(B)(1)). The Court nevertheless views all evidence and factual inferences most favorably to Plaintiff, as the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Plaintiff Brian Donald Haynes has been diagnosed with "moderately severe" hearing loss in his right ear. Pl. SMF at ¶ 3; Pl. Dep. [38] at 94. Plaintiff also contends that he does not have an eardrum in his right ear, and he is unable to hear a range of

speech out of his right ear. Pl. SMF at ¶¶ 1-2; Pl. Dep. [38] at 89-90, 92. While Defendant does not dispute that Plaintiff has been diagnosed with "moderately severe" hearing loss in his right ear, Defendant contends that Plaintiff's Medical Examiner's Certificate for his Commercial Driver's License dated August 5, 2023, indicates that Plaintiff is qualified to drive without a hearing aid, and a hearing examination on September 2, 2014, indicated that Plaintiff had a visible eardrum in his right ear. Def. Resp. to SMF at ¶¶ 1-2; Def. SMF at ¶ 45; Pl. Dep., Ex. 6, 7, 9. Defendant also contends that Plaintiff has never been diagnosed by a medical doctor as having a "disability" because of his "moderately severe" hearing loss. Def. Resp. SMF at ¶¶ 2-3; Def. SMF at ¶ 39; Pl. Dep. at 91, 95, 116, Ex. 9.

Defendant Reddy Ice is a recognized leader in ice production and distribution. Def. SMF at ¶ 1; Pl. Dep., Ex. 8, at 1 ([38-1] at 47). On August 18, 2014, Reddy Ice hired Plaintiff to work as a Maintenance Technician at Reddy Ice's facility in Nashville, Tennessee. Def. SMF at ¶ 2. On Plaintiff's application for employment with Reddy Ice, Plaintiff disclosed that he had hearing difficulties.[1] Pl. SMF at ¶ 4; Pl. Dep. at 39-40. Moreover, in his initial interview with Reddy Ice, Plaintiff also

---

[1] Defendant objects to this fact and many others submitted by Plaintiff on the ground that, *inter alia*, "Plaintiff's testimony is unsupported by admissible evidence, other than Plaintiff's own self-serving conclusory statement." *See* Def. Resp. SMF at ¶¶ 2, 4, 5, 8, 10, 11, 15, 16, 18, 19. The Court notes that this is not a valid basis for an objection under the Local Rules. *See* LR 56.1(B)(3), NDGa. *See* discussion, *infra*.

revealed that he had hearing difficulties, and told them that he would need an accommodation because of his hearing loss: "When I was hired, at the interview process I told them of my hearing and that I would need an accommodation that, because of the noise and the plant levels, anything having to do with regulatory compliance, quotes, anything of major importance, be put in email or writing." Pl. SMF at ¶ 5; Pl. Dep. at 29.

Plaintiff contends that, in response to his statement about having hearing loss, Reddy Ice ordered him to take a hearing test. Pl. SMF at ¶ 6; Pl. Dep. at 29. While Defendant does not dispute that Plaintiff was required to take a hearing test, it contends that Plaintiff testified that Reddy Ice requires all employees to take a hearing test annually. Def. Resp. SMF at ¶ 6; Pl. Dep. at 96 ("Reddy Ice is required to do a hearing test on all employees annually and your baseline is what they start with, and then we see how bad your hearing is getting. If your hearing is getting too bad, then we have written policies to mitigate that hearing loss while you're working at Reddy Ice."). Plaintiff contends that Reddy Ice also replied to his request for an accommodation by stating that "there'd be no problem with that, as the systems it generally operates under all written anyways." Pl. SMF at ¶ 7; Pl. Dep. at 29.

As a maintenance technician, Plaintiff was primarily responsible for ensuring the reliable operation and maintenance of his facility's manufacturing systems and physical property, which required him to perform preventive maintenance,

troubleshoot issues involving his facility's equipment, order spare parts (as needed), and perform small physical property repairs. Def. SMF at ¶ 3.

Effective May 5, 2019, Plaintiff accepted a promotion to a Manufacturing, Processing & Vault ("MP&V") Manager, which required him to relocate from Nashville, Tennessee, to East Point, Georgia. Def. SMF at ¶ 4. In his new role as MP&V Manager, Plaintiff reported to Plant Manager Eddie Shelton. Def. SMF at ¶ 5. Shelton reported to Reddy Ice's Market Manager for Atlanta, Daniel Koah, who held that position from September of 2014 until the end of 2020. Def. SMF at ¶ 7. Plaintiff was not supervised by Michael Forgen, Reddy Ice's Regional Operations Manager; Forgen was assigned to Reddy Ice's Maryland location, and his job duties and responsibilities included assisting other Reddy Ice locations.[2] Def. SMF at ¶ 6.

When Plaintiff was promoted to the MP&V position, he informed management of his hearing difficulties and his need for a reasonable accommodation. Pl. SMF at ¶ 8; Pl. Dep. at 96-97. Plaintiff testified that he informed the following individuals at Reddy Ice about his disability: Mike Forgen, Dan Koah, Eddie Shelton, Craig Vogel, Stephen Burkhart, Jeff Northern, Deb Conklin, Jonathan Judy, Bill Newberry, Mike Greeson, Greg Smith, Randy Panter, and Lee

---

[2] In Plaintiff's Statement of Facts, Plaintiff refers to this individual as both "Forgen" and "Forgren." *See* Pl. SMF at ¶¶ 11, 14, 20. According to Forgen's testimony, it is spelled "Forgen." *See* Forgen Dep. [39] at 9.

Hatch. Pl. Dep. at 96-97. Before December 5, 2019, "most employees" did what Plaintiff requested. Pl. SMF at ¶ 9; Pl. Dep. at 100. Plaintiff testified:

> Q.      In terms of asking for an accommodation, what was the response you received?

> A.    Up until December 5th of 2019, most Reddy Ice employees did what was asked. The last thing they want is something going wrong because there's miscommunication.

Pl. Dep. at 100.

According to Plaintiff, however, from December 5th until January 10, 2020, his request for a reasonable accommodation was not followed by upper management at least eight times. Pl. SMF at ¶ 10; Pl. Dep. at 45 ("from December 5th of 2019 until January 10th of 2020, four successively higher authority at Reddy Ice denied my request for accommodation at least eight times, and the facts are on the record").

Unlike Plaintiff's position of Maintenance Technician, which only required him to perform work tasks assigned to him, Plaintiff's new role as MP&V Manager required him to serve in a managerial role, overseeing MP&V operations and supervising MP&V employees. Def. SMF at ¶ 8. As the MP&V Manager, Plaintiff was responsible for managing capital projects, ensuring project viability, and acting with adaptability and flexibility to non-routine situations with promptness and good business judgment. Def. SMF at ¶ 9. Plaintiff's role as MP&V Manager required him to help oversee capital projects, ensure that his team met production goals set

by upper management, collaborate and take direction from the Plant Manager, and adhere to Reddy Ice's Code of Business Ethics. Def. SMF at ¶ 10.

Defendant contends that, shortly after Plaintiff moved into the MP&V Manager position, "it became clear to Koah that Plaintiff struggled in the MP&V Manager role," and that the "job was too big for him," as Plaintiff was now required to manage an approximately ten-person team of mechanics and operators, and Koah believed that Plaintiff did not have the temperament or leadership capabilities necessary. Def. SMF at ¶ 11; Koah Decl. [36-4] ¶ 11. According to Koah, Plaintiff "consistently clashed" with Plant Manager Shelton and the direction he received from upper management, to the point that he argued with and yelled at Shelton, including instances in which he told both Shelton and Koah that "they did not know what they were talking about" when Shelton and Koah instructed Plaintiff on how to perform work projects.[3]  Def. SMF at ¶ 12; Koah Decl. ¶ 13.

_____

[3] Plaintiff objects to this alleged fact and others on the ground that Koah's statements about what Plaintiff allegedly said to Shelton are "inadmissible hearsay." Pl. Resp. SMF at ¶ 12. Defendant responds that Koah's statements are based on his personal knowledge and reflect only events witnessed by the declarant, and thus are not hearsay pursuant to F.R.E. 801 and/or 803. Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Facts [45] ("Def. Reply PSMF") at ¶ 12. The Court finds that Koah's statements reflect that they are based on his personal knowledge, and are not based on any statement that Shelton allegedly said to him; thus, the Court finds that these alleged statements Plaintiff made to Shelton and Koah are not inadmissible hearsay.

By July of 2019, which was only two months after Plaintiff became MP&V Manager, Shelton and Koah started to discuss Plaintiff's difficulties in fulfilling all of the duties associated with the MP&V Manager position, which, unlike the responsibilities of his previous position, were varied and complex. Def. SMF at ¶ 13. Koah contends that Shelton had to counsel Plaintiff numerous times regarding the appropriate way to speak to colleagues in the workplace and how to handle his role. Def. SMF at ¶ 14; Koah Decl. ¶ 16.

After discussing Plaintiff's unsatisfactory job performance, Shelton and Koah decided that Shelton would work with Plaintiff to try to to address the areas that needed immediate attention. Def. SMF at ¶ 15. Thereafter, Shelton began having informal conversations with Plaintiff regarding his management style and how to better balance the job duties required for the position of MP&V Manager. Def. SMF at ¶ 16; Koah Decl. ¶ 19. Defendant contends that, ultimately, Koah concluded that Plaintiff was unable to fulfill the job duties and responsibilities required of the MP&V position. Def. SMF at ¶ 17; Koah Decl. ¶ 20.

On December 5, 2019, Shelton and Forgen witnessed an incident in which, as described by Shelton in an email to Koah sent on December 12, 2019, Plaintiff acted "as he has done in the past," and showed an "inability to lead [the] team, listen to direction, [and] [be] open to different viewpoints on what's best for the business[,] and [his] difficulty to work with ha[d] escalated." Def. SMF at ¶ 18; Forgen

Dep. [39], Ex. 2 ([39-1] at 5). When Forgen arrived at the East Point facility on December 5, 2019, Forgen asked Plaintiff a few work-related questions, to which Plaintiff responded that he did not have time, had other things to do, and seemed "agitated and upset for no reason." Def. SMF at ¶ 19; Forgen Dep., Ex. 1.

Also on December 5, 2019, while Forgen and Shelton were discussing scheduling options for Reddy Ice's upcoming capital project, Plaintiff "held both his hands up to [Shelton] and . . . 'began yelling stop just stop,' shouted 'I cannot work like this,' and proceeded to storm out of the meeting after screaming 'send me an email.'" Def. SMF at ¶ 20; Forgen Dep., Ex. 1, 2; Koah Decl. ¶¶ 24, 26. While Plaintiff does not dispute that, he contends that he requested an email because his hearing loss prevented him from fully understanding spoken conversations. Pl. Resp. SMF at ¶ 20; Pl. Dep. at 29.

Later that day, when Plaintiff asked Forgen for his feedback about these interactions he had with Shelton, Forgen explained that, in his view, Plaintiff was "being disrespectful" to Shelton by "throwing up his hands yelling stop over and over," and Plaintiff responded that he did not understand why Shelton would be upset by these interactions. Def. SMF at ¶ 21; Forgen Dep., Ex. 1. Plaintiff admitted

that "things got hostile" during this December 5, 2019 incident, and that he "can get

agitated and emotional." Def. SMF at ¶ 22; Pl. Dep. at 46, 143. Plaintiff testified:

> •       "We got one of the roughest jobs there is. We got equipment that
> wants to kill us, and I can get agitated and emotional when you
> repeatedly violate the rules and regulations that we operate under."
>
> •       "We were still having some problems getting everybody to
> conform to some of the procedures. So yes, I would get agitated. Yes,
> he told me I needed help with that and we worked on that."
>
> •       "Sometimes I see you doing something that I've told you eight
> times not to do, my response after the third time may not be what you
> would like it to be."
>
> •       "I'm a human being, I'm not a machine. Yes, I can let my
> emotions get away from me, especially when I've got four people above
> you all wanting you to do something different and there's only one of
> you. So yeah, we can get there."

Def. SMF at ¶ 23; Pl. Dep. at 142-43, 145.

Defendant contends that the "final straw" which led to Plaintiff's termination

involved Plaintiff's "blatant disregard" for Shelton's instructions regarding the same

important capital project undertaken by Reddy Ice in December of 2019. Def. SMF

at ¶ 24; Koah Decl. ¶ 21. Plaintiff disputes this, and contends that "he never heard

anything about what they wanted to do or did not want to do." Pl. Resp. SMF at ¶ 21;

Pl. Dep. at 48. According to Defendant, to help Plaintiff successfully complete the

project, Shelton met with Plaintiff and "communicated his expectations" regarding

the manner in which Shelton expected the project to be completed, the expected

completion date, and importantly, that the project had to be completed entirely by

the contractor and without any Reddy Ice employees. Def. SMF at ¶ 25; Koah Decl. ¶ 22. Defendant contends that, despite the "explicit instructions" Shelton provided to him, Plaintiff unilaterally decided to do things differently from how he had been instructed. Def. SMF at ¶ 26; Koah Decl. ¶ 23. Plaintiff disputes this, and contends that "he never heard anything about what they wanted to do or did not want to do." Pl. Resp. SMF at ¶ 26; Pl. Dep. at 48.

According to Plaintiff, in the meeting on the morning of December 5, 2019, with Shelton and Forgen, Plaintiff asked for details to the meeting to be sent to him in an email because of his hearing loss, but he never received an email as he had requested. Pl. SMF at ¶¶ 11-12, 15; Pl. Dep. at 29, 47 (Q: "December 5th at 8:05 a.m., there was a meeting in which you asked for an email and you're saying the email was not sent to you." A: "Correct."). Further, Shelton acknowledged in his December 12, 2019, email that Plaintiff had requested an email. Pl. SMF at ¶ 13. Plaintiff never heard the plans of what to do or what not to do because they were never communicated to him in an email. Pl. SMF at ¶ 16; Pl. Dep. at 48 ("I never heard anything about what they wanted to do or what they didn't want to do.").

The December 2019 capital project involved installing multiple compressors and replacing gas lines. Def. SMF at ¶ 27. At its location in East Point, Reddy Ice's practice was to avoid assigning its employees to work on capital projects like the one scheduled for December 2019 because Reddy Ice did not have the required

certified staff available and did not wish to divert labor away from Reddy Ice's already busy daily operations. Def. SMF at ¶ 28. When Plaintiff was confronted about his failure to follow Shelton's instructions regarding the December 2019 capital project, Plaintiff responded by stating that "he had been doing this for 40 years and this is how compressor work is done." Def. SMF at ¶ 29; Koah Decl. ¶ 23, Ex. 1. Plaintiff understood that Reddy Ice employees were not to perform compressor change outs. Pl. SMF at ¶ 17.

On December 20, 2019, Koah sent an email to Chloe Price, Reddy Ice's Regional Human Resources Manager at the time, informing her that Reddy Ice needed to terminate Plaintiff's employment due to "insubordination." Def. SMF at ¶ 30; Koah Decl. ¶ 28, Ex. 1 (Koah informed Price that he "[w]ould like to come up with a plan for when [Plaintiff] returns [from leave]. The success of the plant depends on us getting the right person into this role as soon as possible."). Koah also explained in the email to Price that Plaintiff had failed to follow instructions on the December 2019 capital project discussed above, and that he was "very argumentative even with his direct manager and [did] not project the correct attitude to his team." Def. SMF at ¶ 31; Koah Decl. ¶ 27, Ex. 1.

On December 11, 2019, Plaintiff was placed on workers' compensation leave after he lacerated his finger at work. Def. SMF at ¶ 33; Forgen Dep., at 41; Pl. Dep. at 27-28. After Plaintiff returned to work, on January 8, 2020, Shelton emailed Koah

to confirm that he agreed that Reddy Ice needed to terminate Plaintiff's employment. Def. SMF at ¶ 34; Koah Decl. ¶ 29, Ex. 2. Koah then wrote in an email to Price on that same day that the "project failed because Bryan [Haynes] deliberately did not follow Eddie's instructions." Def. SMF at ¶ 33; Koah Decl., Ex. 2. Thus, Defendant contends that Plaintiff's employment was terminated because of his poor work performance. Def. SMF at ¶ 35; Koah Decl. ¶¶ 10, 30.

While Plaintiff does not deny that Defendant contends that he was fired for poor work performance, he contends that his termination was actually "due to miscommunication because management was requesting things to be done in an environment where he could not hear them." Pl. SMF at ¶ 18; Pl. Resp. SMF at ¶ 35; Pl. Dep. at 102. Plaintiff testified that, "when he asks for an email to clarify what was done and when that email does not arrive, there is a misunderstanding." Pl. Resp. SMF at ¶ 35; Pl. Dep. at 102. Plaintiff believes that Management took objection to the way he "put his foot down" and requested an accommodation in writing. Pl. SMF at ¶ 19; Pl. Dep. at 66 ("The retaliation was done because I put my foot down one day and told them they weren't going to do that to me anymore, that I had this accommodation, and that we were going to take it up with HR."). Plaintiff testified that on multiple occasions, Forgen made comments to the effect, "I don't give a damn about your hearing," or "What, you didn't hear me." Pl. SMF at ¶ 20; Pl. Dep. at 65, 122. While Defendant does not dispute that Plaintiff testified that Forgen made

those statements to him, it contends that Forgen was not involved in Defendant's decision to terminate Plaintiff. Def. Resp. SMF at ¶ 20; Forgen Dep. at 44, 49.

On January 10, 2020, during a termination meeting attended by Koah, Shelton, and Price, Plaintiff was informed that he was being terminated because of his poor work performance. Def. SMF at ¶ 36. During that January 10, 2020 meeting, Defendant contends that Plaintiff continued to display the lack of professionalism and temperament that resulted in Reddy Ice's decision to terminate his employment, as Plaintiff "loudly professed" that he has been "doing this [type of work] forever and could read [Koah] the regulation that states we don't need a certified welder on this pipe." Def. SMF at ¶ 37; Koah Decl. ¶ 30. Forgen was not involved in Plaintiff's termination in any way and was also not informed that Plaintiff would be fired prior to the termination. Def. SMF at ¶ 38.

According to Defendant, Plaintiff has not "come forward with any evidence showing that he requested, and was denied, any accommodation relating to his alleged hearing disability," and Plaintiff's only complaint is that he had to "remind [Reddy Ice] about the accommodation." Def. SMF at ¶ 40; Pl. Dep. at 40, 44-45, 99. Plaintiff disputes this and contends that Defendant had a document reflecting that he has "moderately severe" hearing loss. Pl. Resp. SMF at ¶ 40; Pl. Dep. at 94.

Plaintiff also testified that Reddy Ice denied his request for a reasonable accommodation during the meeting held on December 5, 2019, because Plaintiff

alleges he "told [Shelton and Forgen] to send [him] an email stating what projects were cancelled and which ones were not," but he never received the requested email. Def. SMF at ¶ 41; Pl. Dep. at 46, 48-50. Plaintiff also testified that he asked Shelton and Forgen to send him the requested email on December 5, 2019, because he wished to respond "to the both of them stating [his] position and [Plaintiff] [then] would've went to two other authorities higher than [Forgen and Shelton]" regarding the matter. Def. SMF at ¶ 42; Pl. Dep. at 62-63. Plaintiff also testified that the Reddy Ice plant was too loud to hold a normal conversation, all employees wear hearing protection, and "everything" is written down. Def. SMF at ¶ 43; Pl. Dep. at 40, 81.

According to Defendant, Plaintiff testified that, during his tenure as MP&V Manager, there was never an instance in which any "failure to accommodate" resulted in Plaintiff's inability to perform his job duties and responsibilities. Def. SMF at ¶ 44; Pl. Dep. at 55, 60. Plaintiff disputes this, and contends that he testified that he was "not effectively" able to do his job when Reddy Ice failed to accommodate him. Pl. Resp. SMF at ¶ 44; Pl. Dep. at 60. Plaintiff also testified that when emails are not sent, there is miscommunication. Pl. Resp. SMF at ¶ 44; Pl. Dep. at 94. Plaintiff testified as follows:

> Q.   Mr. Haynes, when you were working for Reddy Ice, can you remember any incidence in which the company's failure to accommodate you resulted in you not being able to do your job?

A.   Not effectively.   Again, my job is—part of my job is coordinating maintenance. If you refuse to tell me in an email what your decisions were on canceling projects, I can't effectively help you.

Pl. Dep. at 60.

Plaintiff is currently self-employed and performs "exactly the same" job duties and responsibilities he performed while he was working for Reddy Ice, without any help as it relates to his alleged hearing loss. Def. SMF at ¶ 46; Pl. Dep. at 58-60. Plaintiff believes that Reddy Ice regarded him as disabled because the word "disability" is reflected in paperwork relating to Plaintiff's workers' compensation claim for lacerating his finger at work. Def. SMF at ¶ 47; Pl. Dep. at 113-15.

According to Defendant, Forgen had no knowledge of Plaintiff's alleged disability or his alleged need for a reasonable accommodation. Def. SMF at ¶ 48; Forgen Dep. at 27. Plaintiff disputes that, and contends that he informed Forgen of his disability and his request for a reasonable accommodation. Pl. Resp. SMF at ¶ 48; Pl. Dep. at 96-97. Defendant also contends that Plaintiff never informed Koah that he had any hearing problems, he never said or suggested that he had a disability, and he never requested any accommodations to help him perform his job duties and responsibilities. Def. SMF at ¶ 49; Koah Decl. ¶ 8. Plaintiff disputes this, and contends that he informed Koah of his disability and his need for a reasonable accommodation. Pl. Resp. SMF at ¶ 49; Pl. Dep. at 96-97.

The sole basis for Plaintiff's age discrimination claim is an alleged conversation Plaintiff overheard between an unknown man and Shelton during which the unknown man said the following: "we don't generally have people over 50 years old at our company." Def. SMF at ¶ 52; Pl. Dep. at 86-88. Plaintiff does not know the identity of the man who Plaintiff alleges made this comment. Def. SMF at ¶ 53; Pl. Dep. at 88. Plaintiff does not know if the unknown speaker had the authority to hire or fire, and Plaintiff did not hear whether and how Shelton responded to this unknown person's comment. Def. SMF at ¶ 53.

Plaintiff was born on September 9, 1959; he was 59 years of age when he was promoted to the MP&V Manager position on May 5, 2019, and he was 60 when Reddy Ice informed him on January 10, 2020, that his employment was terminated.[4] Def. SMF at ¶ 54; Pl. Resp. SMF at ¶ 54; Pl. Dep. at 14.

## II.   DISCUSSION

### A.   *Summary Judgment Standard*

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[4] Although it is undisputed that Plaintiff was born on September 9, 1959, Defendant contends that Plaintiff was "sixty-three years of age both when he was promoted to the MP&V Manager position and when Reddy Ice terminated his employment." Def. Resp. SMF at ¶ 54. That appears to be a mathematical or typographical error, because Plaintiff responds that he was actually 59 when he was promoted and 60 when terminated. *See* Pl. Resp. SMF at ¶ 54.

matter of law." Fed. R. Civ. P. 56(a); *see Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *See Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014).

Once the movant has adequately supported its motion by citing to materials in the record, the party opposing summary judgment must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not

resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

B.   *Plaintiff's ADA Claims*

In the Amended Complaint, Plaintiff asserts two counts under the ADA. In Count I, Plaintiff asserts a claim under the ADA that Defendant discriminated against him because of his disability. *See* Amend. Compl. [14] at ¶¶ 24-32. In Count III, Plaintiff asserts a claim under the ADA that Defendant retaliated against him for requesting a reasonable accommodation for his disability. *See id.* at ¶¶ 43-54.

1.   Standards under the ADA

The ADA was "designed to prohibit discrimination against disabled persons and enable those persons 'to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled.'" *Paleologos v. Rehab Consultants, Inc.*, 990 F. Supp. 1460, 1464 (N.D. Ga. 1998) (Carnes, J.) (quoting *Harding v. Winn Dixie Stores, Inc.*, 907 F.Supp. 386, 389 (M.D. Fla. 1995)). Title I of the ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

The definition of "discriminate" includes a failure to make reasonable accommodations to the limitations of that individual with a disability. 42 U.S.C. § 12112(b)(5)(A) ("the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity").

Thus, a plaintiff asserting a claim of disability discrimination under the ADA may assert two distinct types of claims: (1) disparate treatment, and (2) failure to accommodate. *See Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1261-62 (11th Cir. 2007) ("an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA," and a plaintiff is not required to show additional disparate treatment when alleging discrimination on the basis of a failure to accommodate a disability) (emphasis in original). "Disparate treatment involves discriminatory animus or intent and occurs when a disabled individual is treated differently than a non-disabled or less disabled individual because of his disability." *Nadler v. Harvey*, No. 06–12692, 2007 WL 2404705, *4 (11th Cir. Aug. 24, 2007) (unpublished) (citing 42 U.S.C. § 12112(b). "By contrast, a failure to make reasonable accommodation claim requires no animus and occurs

when a covered entity fails to fulfill its affirmative duty to 'mak[e] reasonable accommodation to the known physical or mental limitations of an otherwise qualified [individual] with a disability' without demonstrating that 'the accommodation would impose an undue hardship on the operation of the business.'" *Id*. (quoting 42 U.S.C. § 12112(b)(5)).

In general, the burden of proof for a claim of disability discrimination under the ADA is based on the framework established by the Supreme Court for Title VII employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000) (*McDonnell Douglas* framework generally applies to disability discrimination claims under the ADA); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003) (reviewing disparate treatment disability claim under *McDonnell Douglas* framework and noting that courts of appeals use this framework in disparate treatment ADA cases); *Nadler*, 2007 WL 2404705, at *4; *Bennett v. Dominguez*, 196 F. App'x 785, 791 (11th Cir. 2006).

Under this framework, absent direct evidence of discrimination, a plaintiff may establish a claim of disparate treatment under the ADA by first presenting a *prima facie* case through circumstantial evidence under the same burden-shifting analysis used in Title VII employment discrimination cases. *Wascura*, 257 F.3d at 1242; *see also Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir.

1999). If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse action, such as termination. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). If the defendant produced evidence of a legitimate reason for the adverse action that was unrelated to the alleged disability, the burden shifts back to the plaintiff to "demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

For those cases in which an employee claims that an employer violated the ADA by failing to provide a reasonable accommodation for the employee's disability, however, the Eleventh Circuit has held (albeit in an unpublished case) that the *McDonnell Douglas Corp.* burden-shifting framework does not apply, because there is no additional burden on an employee to prove discrimination if an employer has denied a reasonable accommodation for the employee's disability. *See Nadler*, 2007 WL 2404705, at *9 ("An employer *must* reasonably accommodate an otherwise qualified employee with a *known* disability unless the accommodation would impose an undue hardship in the operation of the business. . . . Thus, applying *McDonnell Douglas* to reasonable accommodation cases would be superfluous, since there is no need to prove discriminatory motivation.") (emphasis in original); *see also Holly*, 492 F.3d at 1262 (in an ADA failure to accommodate case, there are

no additional burdens on defendant to show that it had a legitimate nondiscriminatory reason for terminating plaintiff or on plaintiff to establish that defendant's proffered reasons were pretextual).

2. Count I – ADA Claim of Disability Discrimination

In Count I of the Amended Complaint, Plaintiff asserts a claim under the ADA that Defendant discriminated against him because of his disability. *See* Amend. Compl. [14] at ¶¶ 24-32. Plaintiff alleges that, at all relevant times, he was a qualified individual with a disability under the ADA, and that Defendant was an employer as that term is defined under the ADA. *Id*. at ¶¶ 11-13. He alleges that he has "moderate to severe hearing loss in his right hear and mild hearing loss in his left that substantially limits one or more major life activities." *Id*. at ¶ 24. He also alleges that, because "none of the essential functions [of his position] require adequate hearing," he "was qualified to perform the essential functions of his job with reasonable accommodations." *Id*. at ¶ 28.

In Count I, Plaintiff does not expressly label his claim of discrimination as either a claim based on a failure to provide a reasonable accommodation or a claim based on disparate treatment. *See* Amend. Compl. [14] at ¶¶ 24-32. Based on Plaintiff's allegations in the Amended Complaint, however, the Court infers that Plaintiff intended to assert both types of claims, as he references both his request for an accommodation and his termination.

Plaintiff alleges that Michael Fogen, Operational Manager, was aware of Plaintiff's disability and his need for an accommodation, which was "to communicate in writing." *Id*. at ¶ 26. He also alleges that, on January 4, 2020, Fogen said that he was tired of Plaintiff using his "damn hearing as an excuse." *Id*. at ¶ 30. He alleges that, on January 10, 2020, Defendant fired him "for his alleged insubordination in that he failed to follow and order from Eddie Shelton." *Id*. at ¶ 31. In response to Defendant's statement that he had been insubordinate, Plaintiff asked, "where was the email, when did he say this." *Id*. at ¶ 32.

In Defendant's brief, Defendant has treated Plaintiff's claim of discrimination as based on both on an alleged failure to accommodate his disability and his termination. *See* Def. Br. [36-1] at 14 (arguing that Plaintiff must show that Reddy Ice failed to provide a reasonable accommodation for his disability), 22-25 (arguing that it had a legitimate reason to terminate Plaintiff, and he has failed to show that the reasons were pretextual). In Plaintiff's brief, he also addresses his claim based on a failure to accommodate and his claim based on his termination. *See* Pl. Br. [41] at 4 (arguing that he must show that Defendant failed to provide a reasonable accommodation), 5 (arguing that he must also show that Defendant's reason for his termination was pretextual). Subsequently, in Defendant's reply brief, it responds to Plaintiff's arguments regarding both his claim based on failure to accommodate and his claim based on discriminatory termination. *See* Def. Reply Br. [43] at 8 (arguing

that Plaintiff has failed to show that he requested a reasonable accommodation for his disability), 10-11 (arguing that Plaintiff has failed to show that Defendant's stated reasons for terminating his employment were pretextual).

Thus, based upon the parties' arguments relating to both types of claims, the Court infers that both parties have interpreted Plaintiff's claim of disability discrimination in Count I to encompass both a claim based on a failure to accommodate his disability and a claim based on discriminatory termination. The Court will first discuss Plaintiff's claim of discrimination based on Defendant's alleged failure to provide a reasonable accommodation for his disability, and will then discuss his claim of discrimination based on his termination.

a.    Failure to Accommodate

To prevail on a claim of disability discrimination based on an alleged failure to accommodate, a plaintiff must demonstrate that he: (1) is disabled; (2) was a "qualified individual" when he suffered the adverse employment action; and (3) was discriminated against because of his disability by being denied a reasonable accommodation that would allow him to perform his job or to keep working. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). In addition, a plaintiff must present evidence establishing that his employer had actual knowledge of his alleged disability or regarded him as disabled. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005).

(1)     Does Plaintiff have a Disability?

The first *prima facie* element requires the plaintiff to show that he has a disability as it is defined under the ADA. The relevant provision of the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A); *see also Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). A person may also have a "disability" under the ADA if the person has a record of such an impairment or is regarded as having such an impairment by an employer. *See Mazzeo*, 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1)).

The ADA defines "major life activities" to include "caring for oneself, performing manual tasks, seeing, *hearing*, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A) (emphasis added). In addition, the ADA Amendments Act of 2008 ("ADAAA") amended the ADA in 2008 to further provide that, for the purpose of establishing the existence of a "disability," "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell

growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).[5]

The ADA, as amended by the ADAAA, further provides that "[t]he definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). Thus, a major purpose of the ADAAA was to amend the ADA to make it easier for plaintiffs to establish that a particular mental or physical impairment is covered as a disability under the ADA. *See United States Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016) ("These amendments convey that an extensive analysis is not required to determine whether an individual's impairment is a disability under the ADA.") (citing *Mazzeo*, 746 F.3d at 1268). "[B]y enacting the ADAAA in 2008, Congress eased in part the evidentiary burden on ADA plaintiffs," and "announced that 'the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Vaughan v. World Changers Church Int'l, Inc.*, No. l:13–CV–0746–AT, 2014 WL 4978439 (N.D.Ga. Sept. 16, 2014) (Totenberg, J.) (quoting *Mazzeo*, 746 F.3d at 1268).

---

[5] The ADA was amended by the ADAAA in 2008, and the amendments became effective on January 1, 2009. *See Dickey v. Dollar Gen. Corp.*, No. 08–15901, 2009 WL 3497733, *1 n.3 (11th Cir. Oct. 30, 2009).

Indeed, the regulations implementing the ADAAA state that:

The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard. . . .

The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(1)(i) and (iii).

Furthermore, the regulations also recognize that, in light of those principles, certain types of mental and physical impairments will be considered to be disabilities under the ADA as a general rule. *See* 29 C.F.R. § 1630.2(j)(3)(ii). The regulations explain that, "[g]iven their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward." *Id*. In particular, the Interpretive Guidance to the regulations promulgated under the 2008 amendments explains that "various medical conditions commonly associated with age, such as *hearing loss*, osteoporosis, or arthritis would constitute impairments within the meaning of this part." 29 C.F.R. § Pt. 1630, App. (emphasis added). Furthermore, the ADAAA provides that the "determination of

whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . hearing aids and cochlear implants or other implantable hearing devices." 42 U.S.C. § 12102(4)(E)(i)(I).

In this case, it is undisputed that Plaintiff has been diagnosed with "moderately severe" hearing loss in his right ear, an impairment that would substantially limit hearing, which is expressly defined by the ADA as a "major life activity." Pl. SMF at ¶ 3; Pl. Dep. at 94; *see also* 42 U.S.C. § 12102(2)(A). Plaintiff also contends that he is unable to hear a range of speech out of his right ear. Pl. SMF at ¶¶ 1-2; Pl. Dep. at 89-90, 92. While Defendant does not dispute that Plaintiff has been diagnosed with "moderately severe" hearing loss in his right ear, Defendant contends that Plaintiff's Medical Examiner's Certificate for his Commercial Driver's License dated August 5, 2023, indicates that Plaintiff is qualified to drive without a hearing aid, and a hearing examination on September 2, 2014. Def. Resp. to SMF at ¶¶ 1-2; Pl. Dep., Ex. 6, 7, 9.

Thus, Defendant argues, Plaintiff cannot show that he has a disability because "there is utterly no record evidence that [his] alleged hearing loss 'substantially limits' any of his major life activities, including driving." Def. Br. at 12. Defendant argues further that Plaintiff testified that he is currently self-employed and performs "exactly the same" job duties and responsibilities he performed while he was

working for Reddy Ice, without any help as it relates to his alleged hearing loss, and Plaintiff "has never been diagnosed by a medical doctor as having a disability because of any alleged hearing loss." *Id*.

In support of its argument that Plaintiff's "moderately severe" hearing loss does not constitute a disability under the ADA, Defendant cites to *Gilmore v. Hodges*, 738 F.3d 266 (11th Cir. 2013) and *Barcelona v. Sec'y, Fla. Dep't of Corr.*, 657 F. App'x 896 (11th Cir. 2016), in which the Eleventh Circuit stated that "not all hearing loss amounts to a serious medical condition." Def. Br. at 14 (citing *Gilmore*, 738 F.3d at 276; *Barcelona*, 657 F. App'x at 898). Neither the *Gilmore* nor the *Barcelona* case, however, involved any claim under the ADA; both cases involved claims brought by prisoners under 42 U.S.C. § 1983 for the alleged denial of adequate medical care for a "serious medical need." *See Barcelona*, 657 F. App'x at 897-98; *Gilmore*, 738 F.3d at 276 ("In general, serious medical needs are those 'requiring immediate medical attention.'" (quoting *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010)).

While Defendant concedes that "*Gilmore* and *Barcelona* are not disability discrimination cases," Defendant nevertheless argues that "the analysis in these cases is persuasive because they make the obvious point that not every hearing-related ailment qualifies as a serious medical condition." Def. Br. at 13 n.6. But, as discussed, the ADA does not require that Plaintiff prove that he has a "serious

medical condition," but instead requires him to show that he has "a physical or mental impairment that substantially limits one or more major life activities," or "a record of such impairment." 42 U.S.C. § 12102(1)(A) and (B); *see also Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). Thus, these cases cited by Defendant are inapposite. Because "hearing" is expressly defined as a "major life activity" under the ADA, the Court concludes that there is at least a viable issue of fact as to whether Plaintiff's "moderately severe" hearing loss in his right ear would be considered a disability under the ADA. *See* 42 U.S.C. § 12102(2)(A).

Indeed, even one of the cases cited by Defendant in its brief supports a finding that a person who has even a "slight" hearing loss would have a disability as defined by the ADA. *See Meeks v. Brunswick Hous. Auth.*, No. CV 213-011, 2015 WL 5 1519409 at *11 (S.D. Ga. Mar. 31, 2015) (plaintiff who had "slight hearing loss in low tones" presented sufficient evidence that she had a disability under the ADA). As the court explained, a "substantially limiting" impairment does not mean that a person must have lost the ability to hear completely to be disabled:

> Federal regulations provide that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability under the meaning of this section." 29 C.F.R. § 1630.2(j). "'Substantially limits' is not meant to be a demanding standard." *Id*. Looking at the evidence in the light most favorable to Meeks as the nonmovant, Meeks has

submitted sufficient evidence from which a factfinder could find that she is disabled by a hearing problem.

*Id*. at *11.

In Defendant's reply brief, it argues further that Plaintiff has failed to show that he has a disability because "[t]here are no medical records determining that he has a disability, there is no testimony from any physician attesting that he has a disability, and there is no determination from any recognized authority (such as the Social Security Administration) concluding that he has a disability." Def. Reply Br. at 7. Significantly, Defendant cites to no authority—in the text of the ADA or otherwise—that would impose any such requirement on a plaintiff asserting a claim under the ADA, because there is none.

In sum, the Court finds that, at a minimum, the Plaintiff has presented sufficient evidence to establish a genuine issue of fact as to whether his "moderately severe" hearing loss in his right ear constituted a disability under the ADA. *See Nelson v. N. Broward Med. Ctr.*, No. 12-61867-CIV, 2013 WL 6842034, at *11 (S.D. Fla. Dec. 27, 2013) ("[B]y the terms of the implementing regulations of the ADA, Nelson's hearing loss qualifies as a 'disability,' as the regulations specifically list "hearing" and "communicating" as major life activities.") (citing *Downing v. United Parcel Service, Inc.*, 215 F.Supp.2d 1303, 1309 (M.D. Fla. 2002) (holding that hearing loss meets the ADA requirement that the disability must limit one or more major life activities)); *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp.

1415, 1421 (M.D. Ala. 1996) (a plaintiff who wore a hearing aid "belongs to the protected class" under the ADA, even though he had not been "formally diagnosed as having a hearing deficiency," because "[a] real or perceived hearing loss is a disability within the meaning of the ADA"); *see also McGriff v. Beavercreek City Sch. Dist.*, No. 3:18-CV-372, 2021 WL 2401921, at *8 (S.D. Ohio June 11, 2021) (holding that a plaintiff who testified that she had difficulty hearing someone talking to her if there was background noise such as a copier raised a "jury question" as to whether she had "a physical impairment that substantially limits one or more major life activities").

As discussed, a plaintiff must not only present evidence that he has a disability but also must present some evidence establishing that his employer had actual knowledge of his alleged disability or regarded him as disabled. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005). Defendant argues that "there is no evidence Reddy Ice regarded Haynes as disabled due to any alleged hearing loss, and there is no evidence he was disabled or had a record of disability." Def. Br. at 13. Defendant argues further that "Plaintiff taking a hearing test at the time of hiring says nothing as to whether, six years later, Reddy Ice managers would be on notice of any alleged hearing loss suffered by Haynes." *Id*. at 13 n.5.

To the extent that Defendant is arguing that Plaintiff cannot establish a *prima facie* case because he has failed to present any evidence that Defendant was aware

of his hearing loss, the Court disagrees. As set forth above in the facts, Plaintiff contends that, on his application for employment with Reddy Ice, Plaintiff disclosed that he had hearing difficulties. Pl. SMF at ¶ 4; Pl. Dep. at 39-40. Moreover, in his initial interview with Reddy Ice, Plaintiff also revealed that he had hearing difficulties, and told them that he would need an accommodation because of his hearing loss: "When I was hired, at the interview process I told them of my hearing and that I would need an accommodation that, because of the noise and the plant levels, anything having to do with regulatory compliance, quotes, anything of major importance, be put in email or writing." Pl. SMF at ¶ 5; Pl. Dep. at 29. Plaintiff contends that, in response to his statement about having hearing loss, Reddy Ice ordered him to take a hearing examination. Pl. SMF at ¶ 6; Pl. Dep. at 29.

Moreover, Plaintiff contends that when he was promoted to the MP&V position in 2019, he again informed management of his hearing difficulties and his need for a reasonable accommodation. Pl. SMF at ¶ 8; Pl. Dep. at 96-97. Plaintiff testified that he informed the following individuals at Reddy Ice about his disability: Mike Forgen, Dan Koah, Eddie Shelton, Craig Vogel, Stephen Burkhart, Jeff Northern, Deb Conklin, Jonathan Judy, Bill Newberry, Mike Greeson, Greg Smith, Randy Panter, and Lee Hatch. Pl. Dep. at 96-97.

As noted above in the facts, Defendant objects to Plaintiff's contentions that he informed multiple supervisors and other individuals employed by Defendant

about his hearing loss, and many of Plaintiff's other submitted facts, on the ground that, *inter alia*, "Plaintiff's testimony is unsupported by admissible evidence, other than Plaintiff's own self-serving conclusory statement." *See* Def. Resp. SMF at ¶¶ 2, 4, 5, 8, 10, 11, 15, 16, 18, 19. In Defendant's brief, it also argues that "there is no record evidence of Haynes having ever informed anyone of his alleged hearing loss, other than Haynes' own self-serving statements," and that "there is no evidence that Haynes made any request for a reasonable accommodation, other than Haynes' own self-serving statements." Def. Br. at 1, 16.

The Court notes that objecting to a party's submitted fact on the ground that it is supported only by the party's own testimony is not a valid basis for an objection under the Local Rules. *See* LR 56.1(B)(3), NDGa. There is also nothing in the Local Rules or Federal Rules that requires a party to support his facts with additional "admissible evidence" beyond his own testimony. Rule 56 of the Federal Rules of Civil Procedure expressly provides that depositions and declarations are generally considered a form of evidence that may be relied upon by a court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A) (a party moving for, or opposing summary judgment, may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials").

Moreover, the Eleventh Circuit has consistently held that a plaintiff's testimony alone, even if allegedly "self-serving," may be sufficient to defeat a motion for summary judgment if it establishes a genuine issue of material fact. *See, e.g., Patterson v. Georgia Pac., LLC*, 38 F.4th 1336, 1350–51 (11th Cir. 2022) (holding that the court must credit the non-movant's version of the facts and "that is true even if, as is often the case, the plaintiff's evidence consists primarily or solely of her own self-serving sworn statements or testimony"); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."); *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").

Thus, the Court is not persuaded by Defendant's argument that it should disregard all of Plaintiff's testimony about his hearing loss and his requests for a reasonable accommodation for his hearing loss because his testimony is allegedly "self-serving" or unsupported by other evidence. The Court is not only required to consider Plaintiff's testimony, but it is also required to view all disputed facts and evidence in the light most favorable to him, as the non-movant. Consequently, the Court finds that, at a minimum, Plaintiff has presented sufficient evidence in the

form of his deposition testimony to establish a genuine dispute of fact as to whether he informed Defendant that he had a hearing impairment or hearing loss.

### (2)   Was Plaintiff a Qualified Individual?

The second element of the *prima facie* case requires a plaintiff to establish that he is a "qualified individual." 42 U.S.C. § 12112(a). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Defendant does not dispute that Plaintiff has presented sufficient evidence to establish that he was a "qualified person." *See* Def. Br. at 11-14 (Defendant argues only that Plaintiff cannot establish that he was disabled or that he was discriminated against because of any disability, and it does not argue that Plaintiff was not a "qualified person"). Thus, the Court will move on to the next prong in the analysis.

### (3)   Did Defendant Deny Plaintiff a Reasonable Accommodation?

The third and final element of a plaintiff's *prima facie* case requires him to present sufficient evidence to establish that he was discriminated against because of his disability. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). As noted, the ADA expressly provides that an employer unlawfully discriminates against a qualified individual with a disability when the employer does not make "reasonable accommodations" for the employee, unless "the

accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A); *see also Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927 (11th Cir. 2010) ("An employer impermissibly discriminates against a qualified individual when the employer does not reasonably accommodate the individual's disability."). A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(b).

Determining what is reasonable for each individual employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation. *See Holbrook*, 112 F.3d at 1527. The regulations provide that an employer may restructure a job by reallocating or redistributing non-essential, marginal job functions, but is not required to reallocate essential functions. The essential functions are by definition those that the individual who holds the job would have to perform, with or without accommodation, in order to be considered qualified for the position. *See* 29 C.F.R. 1630.2(n); *Holbrook*, 112 F.3d at 1527; *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (an employer is not required to reallocate job duties in order to change the essential functions of a job);

42

*Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572, 1583 (N.D. Ga. 1994) (a reasonable accommodation does not require an employer to eliminate the essential functions of a position). Thus, if the employee is unable to perform the essential functions of the position with reasonable accommodations, the employer has no duty to eliminate the essential functions of the position or to hire someone else who can perform those functions for the employee.

An employer is not required, however, to provide an employee with "the maximum accommodation or every conceivable accommodation possible." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (quoting *Lewis v. Zilog, Inc.*, 908 F.Supp. 931, 947 (N.D.Ga. 1997)). Furthermore, although the ADA lists types of possible accommodations, the fact that a particular accommodation may be included does not mean that such accommodation is automatically deemed "reasonable" under the statute. *See Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir.1998). The accommodation must also be reasonable based on the specific facts and circumstances of the case. *Id.*; *Stewart*, 117 F.3d at 1285. "An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259-60 (11th Cir. 2001). "In other words, the ADA does not require the employer to eliminate an essential function of the

plaintiff's job." *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (internal citation and quotation omitted).

"The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000); *see also Stewart*, 117 F.3d at 1286. Thus, it is the plaintiff who "bears the burden of identifying a reasonable accommodation that would allow a qualified individual to perform the job, and an employer is not required to accommodate an employee in any manner in which the employee desires." *Gilliard v. Georgia Dep't of Corrections*, 500 F. App'x 860, 868 (11th Cir. 2012) (citing *Stewart*, 117 F.3d at 1285-86). Moreover, an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999) ("[T]he initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her."); *see also Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016).

An employer may need "to initiate an informal, interactive process" with the employee to identify his or her limitations and possible accommodations. 29 C.F.R. § 1630.2(o)(3). But when a plaintiff fails to demonstrate the existence of a reasonable accommodation, "the employer's lack of investigation into reasonable accommodation is unimportant." *Earl*, 207 F.3d at 1367 (*quoting Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)).

In this case, Defendant argues that Plaintiff "cannot show that he requested, and Reddy Ice failed to provide, a reasonable accommodation." Def. Br. at 14. According to Defendant, Plaintiff "has not come forward with any record evidence showing that he requested, and was denied, an opportunity to have any specific work-related communication delivered to him in writing due to his alleged hearing disability," and "there is no evidence that [he] made any request for a reasonable accommodation, other than [his] own self-serving statements." *Id*. at 15. The Court has previously addressed Defendant's argument that Plaintiff's allegedly "self-serving statements" cannot constitute sufficient evidence to establish his claims, and again finds that Plaintiff's own testimony would be admissible "record evidence" to support his claims.

In sum, Plaintiff contends that he told Defendant in his application and initial interview that he had hearing difficulties and would need an accommodation by which certain matters would be communicated in writing. Pl. SMF at ¶ 4, 5; Pl. Dep.

at 29, 39, 40. According to Plaintiff, Reddy Ice replied to his request by stating that "there'd be no problem with that, as the systems it generally operates under all written anyways." Pl. SMF at ¶ 7; Pl. Dep. at 29. When Plaintiff was promoted to the MP&V position in 2019, he again informed numerous specifically-named members of management of his hearing difficulties and his need for a reasonable accommodation. Pl. SMF at ¶ 8; Pl. Dep. at 96-97. Plaintiff further testified:

> Q.    In terms of asking for an accommodation, what was the response you received?
>
> A.    Up until December 5th of 2019, most Reddy Ice employees did what was asked. The last thing they want is something going wrong because there's miscommunication.

Pl. Dep. at 100.

According to Plaintiff, however, from December 5th until January 10, 2020, his request for a reasonable accommodation was not followed by upper management at least eight times. Pl. SMF at ¶ 10; Pl. Dep. at 45 ("from December 5th of 2019 until January 10th of 2020, four successively higher authority at Reddy Ice denied my request for accommodation at least eight times, and the facts are on the record"). Plaintiff contends that, in the meeting with Shelton and Forgen on December 5, 2019, Plaintiff asked for details to the meeting to be emailed because of his hearing loss, but he never received the requested email. Pl. SMF at ¶¶ 11 12, 15; Pl. Dep. at 29, 47 (Q: "December 5th at 8:05 a.m., there was a meeting in which you asked for an email and you're saying the email was not sent to you." A: "Correct.").

Plaintiff also testified that the Reddy Ice plant was too loud to hold a normal conversation, all employees wear hearing protection, and "everything" is written down. Def. SMF at ¶ 43; Pl. Dep. at 40, 81. Thus, Plaintiff contends that he requested on December 5, 2019, that they send him an email because his hearing loss prevented him from fully understanding spoken conversations. Pl. Resp. SMF at ¶ 20; Pl. Dep. at 29. Plaintiff never heard the plans of what to do or what not to do because they were never communicated to him in an email. Pl. SMF at ¶ 16; Pl. Resp. SMF at ¶¶ 21, 26; Pl. Dep. at 48.

On December 20, 2019, Koah sent an email to Chloe Price, Reddy Ice's Regional Human Resources Manager, informing her that Reddy Ice needed to terminate Plaintiff's employment due to "insubordination." Def. SMF at ¶ 30; Koah Decl. ¶ 28, Ex. 1. Koah explained that Plaintiff had failed to follow instructions on the December 2019 capital project and that he was allegedly "argumentative." Def. SMF at ¶ 31; Koah Decl. ¶ 27, Ex. 1. Koah wrote to Price on January 8, 2020, that the "project failed because Bryan [Haynes] deliberately did not follow Eddie's instructions." Def. SMF at ¶ 33; Koah Decl., Ex. 2. Although Defendant contends that Shelton gave Plaintiff "explicit instructions" that he failed to follow, Defendant does not expressly contend that such instructions were provided in an email to Plaintiff. Def. SMF at ¶ 26.

Plaintiff contends that his termination was "due to miscommunication because management was requesting things to be done in an environment where he could not hear them." Pl. SMF at ¶ 18; Pl. Resp. SMF at ¶ 35; Pl. Dep. at 102. Plaintiff testified that, "when he asks for an email to clarify what was done and when that email does not arrive, there is a misunderstanding." Pl. Resp. SMF at ¶ 35; Pl. Dep. at 102. Plaintiff also testified that on multiple occasions, Forgen made comments to the effect, "I don't give a damn about your hearing," or "What, you didn't hear me." Pl. SMF at ¶ 20; Pl. Dep. at 65, 122. Plaintiff testified that he was "not effectively" able to work based on this failure to accommodate. Pl. Resp. SMF at ¶ 44; Pl. Dep. at 60.

Viewing all disputed facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Defendant failed to provide him with a reasonable accommodation for his disability. Plaintiff has shown that he repeatedly requested that all important communications be sent to him in an email specifically because of his hearing loss, but that, starting on December 5, 2019, Defendant failed to do so.

Defendant attempts to characterize Plaintiff's deposition testimony as conceding that he "heard precisely what was said to him by Shelton and Forgen, but he wished to challenge it with their superiors, so he felt he needed it in writing." Def. Br. at 17 (citing Pl. Dep. at 62-63) ("Had I got the email and had they told me that they were going to attempt this project in one day, I would've sent them an email

reiterating my position on this, and I would've cc'd probably the Director of Engineering and the Director of Environmental Health and Safety, because what they were wanting to do violated every written Reddy Ice policy."). But while Plaintiff may have testified that he preferred to receive an email for multiple reasons, nothing in the testimony cited by Defendant indicates that Plaintiff "heard precisely what was said to him by Shelton and Forgen." Instead, Plaintiff expressly contends that he asked for the instructions to be sent to him in an email because his hearing loss prevented him from fully understanding spoken conversations, and he never heard the instructions. Pl. SMF at ¶¶ 11 12, 15, 16; Pl. Resp. SMF at ¶¶ 20, 21, 26; Pl. Dep. at 29, 47-48.

Defendant also argues that Plaintiff's request for specific instructions to be sent to him by email was not a request for a reasonable accommodation, "because it is unrelated to Haynes' ability to perform his essential job functions." Def. Br. at 18-19. But the facts as submitted by both parties indicate that Defendant considered the instructions that Shelton gave to Plaintiff to be an essential function of his job. Indeed, Defendant contends that the "final straw" which led to Plaintiff's termination involved Plaintiff's "blatant disregard" for Shelton's instructions regarding the capital project in December of 2019. Def. SMF at ¶ 24. But Defendant does not contend that Shelton sent those specific expectations to Plaintiff in an email, as Plaintiff claims that he requested. *See* Def. SMF at ¶ 25. In any event, viewing all

49

disputed facts and evidence in the light most favorable to Plaintiff, the Court must credit Plaintiff's testimony that he never received the email that he requested and that lack of an email impaired his ability to follow these essential directions.

Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [36] be **DENIED** as to Count I, Plaintiff's claim of disability discrimination under the ADA, to the extent that claim is based on Defendant's failure to provide a reasonable accommodation for Plaintiff's disability.

b.    Discriminatory Termination

In Count I, Plaintiff asserts a claim under the ADA that Defendant discriminated against him because of his disability. *See* Amend. Compl. [14] at ¶¶ 24-32. Plaintiff alleges that, on January 10, 2020, Defendant terminated him "for his alleged insubordination in that he failed to follow and order from Eddie Shelton." *Id*. at ¶ 31. According to Plaintiff, in response to Defendant's statement that he had been insubordinate, Plaintiff asked, "where was the email, when did he say this." *Id*. at ¶ 32. Thus, the Court infers that Plaintiff is alleging that Defendant discriminated against him based on his disability when it terminated his employment.

(1)    Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must generally demonstrate that: (1) he has a disability as defined in the ADA, (2) he is a "qualified individual," meaning that, with or without reasonable

50

accommodations, he can perform the essential functions of the job; and (3) he was discriminated against because of his disability. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).

The first two elements of Plaintiff's *prima facie* case are discussed above. In sum, although Defendant contends that Plaintiff has failed to present evidence that he has a disability as defined in the ADA, the Court finds that, at a minimum, Plaintiff has presented sufficient evidence to establish a genuine dispute of fact as to whether he is a qualified person with a disability under the ADA.

The third and final element of the Plaintiff's *prima facie* case requires him to present sufficient evidence to establish that he was discriminated against because of his disability. *See Mazzeo*, 746 F.3d at 1268. To do so, Plaintiff must show that he suffered an adverse employment action and that his disability was a determining factor in that adverse action. *See Haines v. Cherokee Cty.*, No. 1:08-CV-2916-JOF-AJB, 2010 WL 2821853, at *16 (N.D. Ga. Feb. 16, 2010) (citing *Nadler v. Harvey*, No. 06–12692, 2007 WL 2404705, *4 (11th Cir. Aug. 24, 2007)), *report and recommendation adopted as modified*, No. 1:08-CV-02916-JOF, 2010 WL 2821780 (N.D. Ga. July 15, 2010). In other words, the ADA requires that Plaintiff show that her disability was a "but for" cause of the adverse action. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-74 (11th Cir. 1996).

In this case, Plaintiff's termination was obviously an adverse employment action and Defendant does not appear to argue otherwise. *See* Def. Br. at 14-18. Defendant's argument rather focuses primarily on Plaintiff's claim based on a failure to accommodate, and does not expressly argue that Plaintiff has failed to present a *prima facie* case related to his termination. *See id*. To the extent that Defendant argues that Plaintiff has failed to present a *prima facie* case related to his termination, Defendant's argument seems to be only that it did not know about Plaintiff's hearing loss or other alleged disability. *See id*. at 16. As discussed, Defendant argues that Plaintiff's "vague requests" to "put something in writing" did not place Reddy Ice on notice of any alleged hearing disability. *Id*. at 15-16.

In general, a plaintiff cannot show that his employer discriminated against him *because of* his disability when the decisionmaker was not even aware of his disability at the time of the adverse action. Thus, to to establish a *prima facie* case, a plaintiff must first establish that his employer had actual knowledge of his alleged disability or regarded him as disabled. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005).

As discussed above in connection with Plaintiff's claim of a failure to accommodate, the undersigned finds that he has presented sufficient evidence to create a genuine dispute of fact as to whether he informed Defendant about his hearing loss, and whether Defendant knew about his alleged disability at the time of

his termination. Nevertheless, an employer's alleged knowledge of an employee's disability is not sufficient to show that the adverse action was *because of* the disability; the ADA requires Plaintiff to show that his disability was a "but for" cause of the adverse action. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-74 (11th Cir. 1996); *see also King v. HCA*, 825 F. App'x 733, 736 (11th Cir. 2020). This means that Plaintiff must show that his disability had a "determinative influence on the outcome of the employer's decision." *King*, 825 F. App'x at 736.

Because Defendant does not expressly challenge this element of the Plaintiff's *prima facie* case, the Court assumes that Plaintiff would be able to present a *prima facie* case of disability discrimination based on his termination. Moreover, viewing all evidence in the light most favorable to the Plaintiff, the Court finds that, because Plaintiff contends that he requested that Defendant provide a reasonable accommodation for his disability "at least eight times" between December 5, 2019, and January 10, 2020, the date of his termination, a jury could be permitted to draw an inference that Defendant's decision to terminate Plaintiff was related to Plaintiff's disability or his request for an accommodation for his disability. *See Barber v. Cellco P'ship*, 808 F. App'x 929, 935 (11th Cir. 2020) ("We have considered temporal proximity relevant in a disability discrimination context, but only when the adverse employment action is very close in time to a discrete event, such as when employers learned about the basis for the alleged discrimination.").

(2)     Defendant's Non-Discriminatory Reason

The burden thus shifts to Defendant to show a legitimate, non-discriminatory reason for the termination. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). As set forth above, Defendant has shown that it had a legitimate reason for terminating Plaintiff's employment that was not because of his alleged disability.

According to Defendant, shortly after Plaintiff moved into the MP&V Manager position in 2019, Plaintiff "consistently clashed" with Plant Manager Shelton and the direction he received from upper management, to the point that he argued with and yelled at Shelton, including instances in which he told both Shelton and Koah that "they did not know what they were talking about" when Shelton and Koah instructed Plaintiff on how to perform work projects. Def. SMF at ¶ 12; Koah Decl. ¶ 13. Defendant contends that, ultimately, Koah concluded that Plaintiff was unable to fulfill the job duties and responsibilities required of the MP&V position. Def. SMF at ¶ 17; Koah Decl. ¶ 20.

On December 5, 2019, when Forgen arrived at the East Point facility, Forgen asked Plaintiff a few work-related questions, to which Plaintiff responded that he did not have time, had other things to do, and seemed "agitated and upset for no reason." Def. SMF at ¶ 19; Forgen Dep., Ex. 1. While Forgen and Shelton were discussing scheduling options for Reddy Ice's upcoming capital project, Plaintiff "held both his

hands up to [Shelton] and . . . 'began yelling stop just stop,' shouted 'I cannot work like this,' and proceeded to storm out of the meeting after screaming 'send me an email.'" Def. SMF at ¶ 20; Forgen Dep., Ex. 1, 2; Koah Decl. ¶¶ 24, 26. Later that day, Forgen explained to Plaintiff that, in his view, Plaintiff was "being disrespectful" to Shelton by "throwing up his hands yelling stop over and over," and Plaintiff stated in response that he did not understand why Shelton would be upset by these interactions. Def. SMF at ¶ 21; Forgen Dep., Ex. 1. Plaintiff admitted that "things got hostile" during this December 5, 2019 incident, and that he "can get agitated and emotional." Def. SMF at ¶ 22; Pl. Dep. at 46, 143.

Defendant contends that the "final straw" which led to Plaintiff's termination involved Plaintiff's "blatant disregard" for Shelton's instructions regarding the capital project undertaken by Reddy Ice in December of 2019. Def. SMF at ¶ 24; Koah Decl. ¶ 21. Defendant contends that, despite the "explicit instructions" Shelton provided to him, Plaintiff unilaterally decided to do things differently from how he had been instructed. Def. SMF at ¶ 26; Koah Decl. ¶ 23.

On January 8, 2020, after Plaintiff returned to work after his workers compensation leave, Shelton emailed Koah to confirm that Reddy Ice needed to terminate Plaintiff's employment. Def. SMF at ¶ 34; Koah Decl. ¶ 29, Ex. 2. Koah then wrote in an email to Price on that same day that the "project failed because Bryan [Haynes] deliberately did not follow Eddie's instructions." Def. SMF at ¶ 33;

Koah Decl., Ex. 2. Thus, Defendant contends that Plaintiff's employment was terminated because of his poor work performance. Def. SMF at ¶ 35; Koah Decl. ¶¶ 10, 30. On January 10, 2020, during a termination meeting attended by Koah, Shelton, and Price, Plaintiff was informed that he was being terminated because of his poor work performance. Def. SMF at ¶ 36. During that January 10, 2020 meeting, Defendant contends that Plaintiff continued to display the lack of professionalism and temperament that resulted in Reddy Ice's decision to terminate his employment, as Plaintiff "loudly professed" that he has been "doing this [type of work] forever and could read [Koah] the regulation that states we don't need a certified welder on this pipe." Def. SMF at ¶ 37; Koah Decl. ¶ 30.

Accordingly, the Court finds that Defendant has provided sufficient evidence that it had a legitimate reason to terminate Plaintiff's employment.

### (3)    Pretext

The burden thus shifts back to Plaintiff to establish that a discriminatory intent actually motivated the employer's action. *See Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 796 (11th Cir.), *opinion amended on reh'g*, 850 F.2d 1549 (11th Cir. 1988) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

Under the *McDonnell Douglas* framework, a plaintiff may carry the burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or

that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory or retaliatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In other words, the plaintiff can show evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas Corp.*, 411 U.S. at 804.

A plaintiff may carry his burden of establishing pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *see also Alvarez v. Royal Atl. Developers*, 610 F.3d 1253, 1265 (11th Cir. 2010). However, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cty. Comm. of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020).

"To demonstrate pretext, the plaintiff may not simply 'recast an employer's proffered [] reason[ ] or substitute [her] business judgment for that of the employer.'" *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 914 (11th Cir. 2009) (*per curiam*) (second alteration in original) (quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)). Instead, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. This is because "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. . . . Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citation omitted).

Thus, the Eleventh Circuit has held that, even if an employer is mistaken or wrong about the basis of its reason, an employer's "mistaken belief" does not constitute evidence of pretext. *See Eubanks v. Henry Cty.*, 626 F. App'x 250, 256 (11th Cir. 2015) ("we have explained that a mistaken belief about an employee's qualifications does not demonstrate pretext); *see also Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.") (internal marks and citations omitted).

In this case, Plaintiff argues that he has presented sufficient evidence to show that Defendant's purported reason for his termination is pretexual. Pl. Br. at 5. Plaintiff contends that "many of the examples upon the Reddy Ice supports it conclusion are based on facts that occurred on December 5, 2019," which was the same day that Plaintiff told his supervisors that he could not hear what "he was told to do or not to do." *Id*. (citing Pl. Dep. at 48). Plaintiff claims that "he had to put his foot down to demand his accommodations be met," and "[b]ased on the overlap between both versions of [events], a reasonable jury could find Reddy's justification unworthy of credence." *Id*. (citing Pl. Dep. at 66).

For its part, Defendant argues that the evidence "contains multiple, documented incidents in which Plaintiff failed to conduct himself appropriately as a manager," and that Koah lost confidence in Plaintiff as a leader. Def. Br. at 23-24. Defendant notes that Plaintiff has admitted that he became "agitated" at work, and he also acknowledged that he had "severe communications problems at work." *Id*. (citing Pl. Dep. at 142-43, 145).

The Court finds that Plaintiff has presented sufficient evidence to allow a jury to find that Defendant's purported reason for his termination was false or that it was a pretext to hide that the real reason was because of Plaintiff's disability or his need for accommodations for his disability. To be sure, Defendant has presented evidence that Plaintiff clashed with Shelton and that Koah believed that Plaintiff was unable

to fulfill the job duties and responsibilities required of the MP&V position. But the evidence also shows that Defendant placed great weight on Plaintiff's alleged failure to follow the instructions allegedly given to him by Shelton on December 5, 2019, as the "final straw" in its decision to terminate his employment, when Plaintiff has presented evidence that he requested that those instructions be sent to him in an email as a reasonable accommodation for his disability, which he claims that Shelton failed to do.

In sum, the Court finds that Plaintiff has present sufficient evidence that would allow a reasonable factfinder to conclude that "but for" his hearing loss and his need for accommodations for his hearing loss, Defendant would not have terminated his employment. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [36] be **DENIED** as to Count I, Plaintiff's claim of disability discrimination under the ADA, to the extent that claim is based on Defendant's termination of Plaintiff's employment.

### 3. Count III – ADA Claim of Retaliation

In Count III of the Amended Complaint, Plaintiff alleges that Defendant retaliated against him in violation of the ADA. *See* Amend. Compl. [14] at ¶¶ 43-53.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The Eleventh Circuit has held that, because this provision creates a prohibition on retaliation under the ADA that is similar to the prohibition on retaliation found in Title VII, courts should evaluate ADA retaliation claims under the same framework used for Title VII retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1075–77 (11th Cir. 1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case).

Under this framework, a plaintiff must present evidence sufficient to establish a *prima facie* case of retaliation. *See Stewart*, 117 F.3d at 1287. To do so, a plaintiff must show the same elements generally required for a claim of unlawful retaliation under Title VII: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action, and (3) there is some causal connection between the expression and the adverse employment action. *Stewart*, 117 F.3d at 1287. In this case, Defendant argues that Plaintiff has failed to present a *prima facie* case of retaliation because, it argues, he has failed to cite to any evidence supporting his claim that he engaged in a protected expression, and he has also failed to cite to evidence that there was a causal link between any alleged protected expression and the termination of his employment. Def. Br. at 18-19.

In Plaintiff's response brief, however, he fails to address Defendant's argument regarding his retaliation claim, and does not even mention his retaliation claim. *See* Pl. Br. [41]. Thus, Plaintiff—who is represented by counsel in this case and is not proceeding *pro se*—has abandoned any claim of retaliation under the ADA. *See McMaster v. United States*, 177 F.3d 936, 940–41 (11th Cir. 1999) (noting that a claim may be considered abandoned when the allegation is included in the plaintiff's complaint, but he fails to present any argument concerning this claim to the district court); *White v. City of LaGrange, Ga.*, 952 F. Supp. 2d 1353, 1357 (N.D. Ga. 2013) (finding claims abandoned because plaintiff did not respond to arguments in motion for summary judgment as to those claims).

Accordingly, because Plaintiff has failed to respond to Defendant's argument that he has failed to present sufficient evidence of a *prima facie* case to support his claim of retaliation under the ADA, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [36] be **GRANTED** as to that claim in Count III of the Amended Complaint.

C.    *Count II – Hostile Work Environment under Title VII*

In Count II, Plaintiff alleges that Defendant subjected him to a "hostile work environment" in violation of Title VII. *See* Amend. Compl. [14] at ¶¶ 33-42. Plaintiff alleges that, at all relevant times, he "had moderate to severe hearing loss in his right ear and mild hearing loss in his left that substantially limits one or more major life

activities." *Id*. at ¶ 33. He further alleges that he was subjected to "unwelcome harassment each time Defendant disregarded his request for reasonable accommodation." *Id*. at ¶ 35.

Plaintiff alleges that, on December 5, 2019, he asked Shelton to have a conversation in his office to avoid the sounds of the production floor, but Shelton "persisted on speaking over loud machinery." *Id*. at ¶ 36. He further alleges that, on January 3, 2020, Forgen said to him, "I am about sick and tired of you spouting federal rules, regulations, and codes. I don't want to hear another damn word about your damn ears, your hearing, how damn old you are or how long you have been doing this." *Id*. at ¶ 37. He also alleges that, on January 4, 2020, Forgen said to him that he was tired of Plaintiff bringing up his "damn hearing as an excuse." *Id*. at ¶ 41.

Plaintiff has asserted this claim of an alleged hostile work environment under Title VII, which provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Significantly, however, Plaintiff does not allege that Defendant subjected him to a hostile working environment or otherwise discriminated against him based on his race, color, religion, sex, or national origin. Instead, Plaintiff alleges that he had moderate to severe hearing loss, and that he was

subjected to "unwelcome harassment each time Defendant disregarded his request for reasonable accommodation." Amend. Compl. at ¶ 33, 35.

As Defendant argues, however, Title VII does not cover "disability" as a protected class, and thus, Plaintiff's claim under Title VII must be dismissed. *See* Def. Br. at 21. The Court agrees that Plaintiff had not alleged any facts to state a claim for a hostile work environment under Title VII, because he does not allege in the Amended Complaint that Defendant discriminated against him or harassed him based on his race, color, religion, sex, or national origin.

As Plaintiff is represented by counsel, the Court is not to construe the Complaint liberally as asserting a hostile working environment claim under the ADA as opposed to Title VII. Regardless, Plaintiff does not respond to Defendant's Motion for Summary Judgment as to this claim and thus has abandoned it. *See McMaster v. United States*, 177 F.3d 936, 940–41 (11th Cir. 1999) (noting that a claim may be considered abandoned when the allegation is included in the plaintiff's complaint, but he fails to present any argument concerning this claim to the district court); *White v. City of LaGrange, Ga.*, 952 F. Supp. 2d 1353, 1357 (N.D. Ga. 2013) (finding claims abandoned because plaintiff did not respond to arguments in motion for summary judgment as to those claims).[6]

_____

[6] Alternatively, even if the Court were to assume that Plaintiff intended to assert his claim for a hostile work environment based on his alleged disability under the ADA,

Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [36] be **GRANTED** as to Plaintiff's claim of a hostile environment in Count II of the Amended Complaint.

D.     *Count IV - Age Discrimination under the ADEA*

In Count IV, Plaintiff alleges that Defendant discriminated against him based on age, in violation of the ADEA. *See* Amend. Compl. [14] at ¶¶ 55-57. Plaintiff alleges that, at all relevant times, he was over the age of forty. *Id*. at ¶ 55. He alleges that, on December 5, 2019, Shelton said to Plaintiff, "I don't need an old man who

_____

the claim would fail on the merits. While the Eleventh Circuit has not expressly recognized a hostile work environment claim under the ADA, it has assumed in unpublished cases that such a claim would be viable under the ADA, per the same standards as Title VII. *See, e.g.*, *Stewart v. Jones Util. & Contracting Co. Inc.*, 806 F. App'x 738, 741 (11th Cir. 2020) ("as the ADA uses identical language [to Title VII], we assume for purposes of this opinion that an ADA hostile-work-environment claim exists as well").

Under these standards, among other things, a plaintiff must show that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

Plaintiff contends only that Forgen made comments to the effect, "I don't give a damn about your hearing," or "What, you didn't hear me." Pl. SMF at ¶ 20; Pl. Dep. at 65, 122. Although Plaintiff contends that this happened on "multiple occasions," Plaintiff has not cited to evidence that would demonstrate that these comments were sufficiently severe or pervasive to rise to the level of creating a hostile work environment that affected the terms and conditions of his employment.

thinks he knows everything telling me what to do." *Id*. at ¶ 56. He also alleges that, on January 3, 2020, Forgen said, "I am about sick and tired of you spouting federal rules, regulations, and codes. I don't want to hear another damn word about your damn ears, your hearing, how damn old you are or how long you have been doing this." *Id*. at ¶ 57.

The ADEA protects individuals over the age of 40 and, in relevant part, prohibits an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any [such] individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1) and 631(a); *see also Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015).

The Eleventh Circuit has held that the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) to analyze claims of discrimination under Title VII is generally also applicable to analyzing claims of age discrimination under the ADEA. *See Walker v. NationsBank of Fla.*, 53 F.3d 1548, 1556 (11th Cir. 1995); *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

Defendant argues that Plaintiff has presented no direct evidence that Defendant terminated him because of his age. To the extent that Plaintiff is able to present a *prima facie* case of age discrimination, Defendant argues that it has

presented sufficient evidence that it had a legitimate reason to terminate Plaintiff's employment that was unrelated to his age—his poor work performance—and Plaintiff has failed to present any evidence that Defendant's purported reason for his termination was merely a pretext to disguise its intention to terminate him because of his age. *See* Def. Br. at 22-23.

As with many of the other claims discussed above, Plaintiff's brief fails to address Defendant's argument regarding his age discrimination claim, and does not even mention his age or his ADEA claim. *See* Pl. Br. [41]. Thus, Plaintiff has abandoned his claim of age discrimination under the ADEA. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [36] be **GRANTED** as to that claim in Count IV of the Amended Complaint.

## III.   RECOMMENDATION

Thus, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [36] be **GRANTED IN PART, DENIED IN PART**.

Specifically, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [36] be **GRANTED** as to Plaintiff's claim of retaliation under the ADA, Plaintiff's claim of a hostile environment under Title VII, and Plaintiff's claim of age discrimination under the ADEA, and that judgment be entered in favor of Defendant as to Counts II, III, and IV of the Amended Complaint.

**IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [36] be **DENIED** as to Plaintiff's claim of disability discrimination under the ADA in Count I of the Amended Complaint. If this recommendation is adopted, this case would proceed as to Plaintiff's claim of disability discrimination under the ADA based on Defendant's alleged failure to provide a reasonable accommodation for Plaintiff's disability and Plaintiff's alleged discriminatory termination.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 8th day of January, 2024.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE